**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **SHARP DETAILS, LLC d/b/a PRIME APPEARANCE,**<br><br>Plaintiff,<br><br>v.<br><br>**JONATHAN GARY and AIRWORTHY DETAILING SPECIALISTS, LLC d/b/a REALCLEAN AIRCRAFT DETAILING PALM BEACH**<br><br>Defendant. | Civil Action No. 4:26-cv-6920 |

**PLAINTIFF SHARP DETAILS, LLC d/b/a PRIME APPEARANCE'S VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff Sharp Details, LLC d/b/a Prime Appearance ("**Plaintiff**" or "**Prime Appearance**"), by and through its undersigned counsel, hereby brings this Verified Complaint for Injunctive relief against Defendants Jonathan Gary ("**Gary**") and Airworthy Specialists, LLC d/b/a RealClean Aircraft Detailing Palm Beach ("**RealClean**") (collectively, "**Defendants**"), and states as follows:

## INTRODUCTION

1. This is the classic case of an employee who signs a contract with certain, limited restrictive covenants, resigns his employment, proceeds to violate those covenants, and then steals a trade secret pricing list for good measure.

2. Gary agreed to the Confidentiality, Non-Disclosure and Business Protection

Agreement (the "**Agreement**") as a condition of his employment with Prime Appearance.[1]

3. Gary resigned his employment with Prime Appearance. His last day was March 26, 2026. Unbeknownst to Prime Appearance, in the days prior to his resignation, he sent a highly confidential pricing list to his Gmail account and to another employee who was not authorized to receive this information.

4. Gary then commenced work for RealClean, doing the same things for them that he did for Prime Appearance. He is working at the same airports and is soliciting and attempting to service many of the same customers. Additionally, upon information and belief, he also solicited several of his coworkers from Prime Appearance to join him.

5. Gary's actions violate the Agreement. They also constitute misappropriation of Prime Appearance's trade secrets in violation of the Defend Trade Secrets Act and Texas Uniform Trade Secrets Act. Prime Appearance engaged in a lengthy back and forth with RealClean's franchisor over these issues before the franchisor abruptly pulled out the rug on the discussions in July 2026 by saying that it would not speak on behalf of RealClean. Left with no other options, Prime Appearance seeks injunctive relief and money damages from this court to protect its most important clients and relationships.

## PARTIES AND JURISDICTION

6. Plaintiff Sharp Details, LLC d/b/a Prime Appearance is a Virginia limited liability company with its corporate headquarters and principal place of business located at 3 Sugar Creek Center Blvd., Suite 450, Sugar Land, Texas 77478.

7. Defendant Jonathan Gary is an individual who, upon information and belief, is a

---

[1] A true and correct copy of the Agreement executed by Gary is attached hereto as Exhibit A.

resident of Florida living at 1649 Lindley Street, West Palm Beach, Florida 33407.

8. Defendant RealClean is a Florida limited liability company with its principal place of business located at 172 Hampton Circle, Jupiter, Florida 33458.

9. Personal jurisdiction is proper in this Court as to Gary because the Agreement's valid forum selection clause names this Court as the proper forum for any claims arising out of the Agreement. (*See* Ex. A, § II(H).).

10. Personal jurisdiction is proper in this Court as to RealClean because: (1) its franchisor-parent company regularly conducts business in Texas and thus has systematic, continuous, and substantial contacts with Texas; (2) it tortiously and intentionally interfered with a contact that was formed in Texas and is governed by Texas law with a Texas forum selection clause (which, upon information and belief, it knew or should have known after Plaintiff notified it of the Agreement); and (3) its unlawful acts directed at Plaintiff have caused and will continue to cause damages and harm to Plaintiff in Texas.

11. This court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Prime Appearance is bringing a claim for trade secret misappropriation pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq*.

12. Venue is proper in this Court because of the valid forum-selection clause contained in the Agreement. (*See* Ex. A, § II(H).).

## FACTUAL ALLEGATIONS

### I. Background and Business of Prime Appearance

13. Prime Appearance provides industry-leading interior and exterior aircraft appearance services for the general aviation industry with operations across the country.

14. Prime Appearance offers a wide range of aircraft detailing services including exterior detailing, paint protection, leather protection, as well as interior detailing and restoration

services, transient support, and more.

15. Prime Appearance operates nationwide and provides aircraft appearance services at airports in 24 states and the District of Columbia, including the following: Arizona, California, Connecticut, Florida, Georgia, Illinois, Indiana, Kansas, Massachusetts, Michigan, Nebraska, New Jersey, New York, North Carolina, Pennsylvania, Texas, Utah, Virginia, and Washington.

16. The aircraft detailing industry is highly competitive, with numerous entities seeking to acquire customers for their products and services.

17. Prime Appearance has developed a reputation for superior and reliable aircraft detailing services. Prime Appearance's relationships with its customers are based on confidence in the quality of the products and services offered and Prime Appearance's commitment to providing such products and services and competitive prices.

18. Prime Appearance's efforts and success in the industry have allowed it to develop goodwill and relationships with its clients in Florida and throughout the United States.

19. Equally critical to Prime Appearance's success, however, is its investment into the safeguarding of the confidential and trade secret information that is central to its business platform. By implementing physical and electronic security measures, Prime Appearance protects its prized assets—its trade secrets and confidential information—acquired and developed through continued investment.

20. Prime Appearance developed, compiled, and acquired its trade secrets and confidential information at great expense and through substantial efforts. Prime Appearance's trade secrets and confidential information are not readily ascertainable in the industry or in any type of trade or public directory or any other source.

21. Prime Appearance requires that its client and business information be kept strictly

confidential by its employees.

22. Prime Appearance takes substantial efforts to protect its confidential information because a competitor could use that information to undercut Prime Appearance on pricing, move business and longstanding client relationships away from Prime Appearance, poach employees from Prime Appearance, and obtain an unfair advantage in its development of products and services.

23. As such, Prime Appearance devotes substantial resources to the protection of information critical to the success of its business, the value of which depends on it being maintained as confidential and used only for Prime Appearance's benefit. Prime Appearance has taken steps reasonable under the circumstances to maintain the secrecy of its confidential information and trade secrets, such as: (a) utilizing password-protected secure cloud-based systems, networks, and computers to store and maintain much of its confidential, proprietary, and trade secret information; (b) limiting access to its secure system to employees and certain other authorized individuals; (c) further limiting access to its trade secrets by employees on a need-to-know basis; and (d) maintaining lawful confidentiality agreements to ensure the security of its most sensitive information.

24. Additionally, Prime Appearance requires its employees with access to its sensitive information to agree to confidentiality covenants like the one contained in Gary's Agreement.

25. Prime Appearance also maintains policies against the disclosure of confidential business information and trade secrets, including, but not limited to, customer lists, employee lists, pricing lists and information, financial information about Prime Appearance's business operations, and pending projects and proposals.

## II. Gary's Employment with Prime Appearance and the Agreement

26. Gary joined Prime Appearance on or about November 14, 2022 when his former

employer, Immaculate Flight, was acquired by Prime Appearance. Gary was employed as a Senior Operations Manager during his employment with Prime Appearance.

27. In acquiring Immaculate Flight, Prime Appearance also acquired all of its valuable assets, including its investment into its employees (such as Gary's training) and its customer goodwill.

28. In his role as a Senior Operations Manager, Gary was responsible for selling Prime Appearance's services to customers, building relationships with new customers, maintaining relationships with existing customers, performing the aircraft detailing services provided by Prime Appearance, and managing other Prime Appearance employees in their performance of those same services in the State of Florida.

29. In his senior position with Prime Appearance, Gary was entrusted with Prime Appearance's trade secrets and confidential information to perform the essential functions of his job. In exchange for the benefits that employment with Prime Appearance confers, Prime Appearance requires that its employees who have access to its confidential information and trade secrets, like Gary, agree to certain restrictive covenants in order to protect its confidential and trade secret information, such as internal processes, formulas, methods, developments, designs, improvements, inventions, computer systems, plans, manuals, marketing plans, strategies, forecasts, proposals, new products, unpublished financial statements, budgets, projections, licenses, sales, prices, costs, leads, supplier lists, customer lists, employee lists, employee performance information, information regarding which Prime Appearance employees are critical to specific customers, and other nonpublic business information about Prime Appearance and its customers.

30. Prime Appearance invested substantial time and money into training Gary in the

business of aircraft detailing over the course of his tenure with Prime Appearance and Immaculate Flight. As a result, Gary gained a set of specialized skills and abilities with respect to the competitive, complicated business of aircraft detailing.

31. Additionally, Prime Appearance gave Gary substantial exposure to its customers and vendors such that he gained a high level of notoriety as the face of Prime Appearance with those customers and vendors and gained a substantial level of influence and credibility with those customers and vendors.

32. Prime Appearance paid substantial compensation to Gary in return for his services, paying him over $110,000 in 2025.

33. Accordingly, as a condition of the commencement of his employment with Prime Appearance, and in exchange for substantial compensation and his access to Prime Appearance's confidential and proprietary information and customers, Gary executed the Agreement, which contains several limited restrictive covenants.

34. Section 1(A) of the Agreement contains the following Confidentiality and Nondisclosure provision:

> As part of Employee's employment, Employer has and will provide Employee with confidential and proprietary information and/or trade secrets belonging to Employer including, but not limited to, lists of customers and information on existing and potential customers, customer preferences, customer pricing, retail pricing, supplier and vendor lists, information relating to Employer's relationships with vendors and other third parties, financial records, marketing strategies, business plans, pending projects and proposals, proprietary operational processes, research and development strategies, new products or product research, sales information, technological data, technological prototypes, acquisition and divestment deals, proprietary information, such as trade secrets as defined under federal and applicable state law, patents and copyrighted materials, and any other non-public proprietary information, and other proprietary and technical knowhow, including training and valuable trade and professional development resources and skills (collectively, "Confidential Information").
>
> Employee agrees that Employee will not, except as required in the performance of

> Employee's job duties, use, publish, or disclose outside the organization any of Employer's Confidential Information, whether in original, duplicated, computerized, memorized, handwritten, or any other form. Employee agrees to use such Confidential Information exclusively for the benefit of Employer. Employee will not remove from the premises or from Employer's databases any originals or copies of Employer's Confidential Information, except as authorized in the normal course of business. Employee also agrees that upon termination of Employee's employment or upon request by Employer, Employee will return to Employer all documents, lists, records, manuals, or other repositories of Confidential Information. Employee agrees that all records, files, plans, software, documents and the like relating to Employer's business which Employee prepares, uses, or comes into contact with shall be and shall remain the sole property of Employer.
>
> Employee acknowledges that Employer's Confidential Information has independent economic value, actual or potential, that is not generally known to the public or to others who could obtain economic value from their disclosure or use, and that this information is subject to the Employer maintaining its secrecy and confidentiality.

(Ex. A, § I(A).)

35. Gary also agreed to a limited non-competition covenant for a period of 12 months following the end of his employment with Prime Appearance:

> Ancillary to the confidentiality/non-disclosure agreements between Employee and Employer, above, and in consideration for the promises made by Employer, Employee agrees that for a period of twelve (12) months following Employee's separation of employment from Employer for any reason, Employee will not, directly or indirectly, provide services to: (1) a direct competitor or customer that were provided to Employer by Employee during Employee's period of employment with Employer; or (2) a prospective customer whom Employer provided a proposal to during Employee's period of employment with Employer. In addition, Employee agrees that Employee will not solicit any of Employer's customers with whom Employee had material contact for the purpose of providing products or services that are competitive with those provided by Employer. For purposes of this Agreement, the term "material contact" exists between Employee and each customer: (1) that Employee regularly dealt with during the last twelve (12) months of Employee's employment with Employer; (2) whose dealings with Employer Employee coordinated or supervised during the last twelve (12) months of Employee's employment with Employer; or (3) about whom Employee obtained confidential information as a result of Employee's association with Employer. If Employee is in a position of state, regional, or national activity (such as sales) this Section B (2) applies to the applicable state or region, or applies to the United States. If Employee is a manager at a specific airport, this Section B (2) applies at that applicable airport and to a 100-mile radius of it.

(Ex. A, § I(B)(2).)

36. Additionally, Gary agreed to refrain from soliciting certain Prime Appearance employees and for a period of six months:

> During the term of Employee's employment with Employer and for a period of six (6) months following the termination of Employee's employment with Employer, Employee shall not directly or indirectly, whether for Employee's own account or for or with any other person or entity whatsoever solicit for employment or otherwise seek to employ any person who (i) was employed by Employer during Employee's employment by Employer; or (ii) was employed by any customer of Employer and with whom Employee had direct contact during Employee's employment with Employer. This section does not apply to Employee's involvement in a subsequent employer's general solicitations for employment which are not in any manner targeted at Employer's employees.

(Ex. A, § I(B)(3).)

37. The Agreement further provides that "If Employee violates any of the covenants set forth above, then the applicable restricted period shall automatically be tolled for a period of time equal in length to the period during which such violation(s) occurred and until any litigation matter concerning the enforceability of such covenants has resolved." (Ex. A § I(B)(5).)

38. By executing the Agreement, Gary acknowledged that Prime Appearance would be entitled to preliminary and permanent injunctive relief in the event Gary breached any of the Agreement's restrictive covenants. (Ex. A, § II(D).)

39. Prime Appearance has complied with its contractual obligations to Gary.

## III. Gary's Violations of the Agreement and Misappropriation of Prime Appearance's Confidential Information and Trade Secrets

40. Gary's employment with Prime Appearance ended on March 26, 2026, shortly after he stated his intention to resign his position as a Senior Operations Manager on March 17, 2026. Despite the promises Gary made to Prime Appearance by signing the Agreement, Prime Appearance has discovered that Gary joined a direct competitor within the restricted territory, stole

confidential information and trade secrets, and is actively soliciting Prime Appearance's customers and employees, all in direct violation of the Agreement.

41. Prime Appearance understands that Gary joined RealClean, a direct competitor of Prime Appearance, after leaving Prime Appearance and immediately began violating his Agreement. Upon information and belief, Gary is performing the same duties for RealClean as he performed for Prime Appearance throughout Florida.

42. First, Prime Appearance has discovered that, ***on the day he submitted his resignation to Prime Appearance***, Gary blind-copied his personal email address (jonathangarysr@gmail.com) on an email from his Prime Appearance email account which contained Prime Appearance's highly confidential and proprietary pricing list for the state of Florida. This list contains the names of many of Prime Appearance's Florida customers, along with the corresponding pricing provided to each individual customer. The list was developed through years of experience and investment, and derives significant value from being secret. The pricing list is based on various factors, such as customer needs, capabilities, relationship statuses, among many other factors.

43. The list constitutes Prime Appearance's trade secret as it is not in the public domain, it is subject to strict confidentiality controls, it is highly valuable to Prime Appearance, and it would be similarly valuable in the hands of a competitor like RealClean. For example, a competitor with access to this information could easily undercut Prime Appearance's pricing.

44. Gary also sent the same list to another Prime Appearance employee, David Rodriguez, who also left Prime Appearance shortly thereafter in July of 2026 and immediately joined RealClean.

45. Gary was not authorized in any way to send this list to his personal email or Mr.

Rodriguez, who was not in a position with authorization to view or receive—or a general need to know—this information.

46. Upon information and belief, Gary is utilizing this pricing list (among other things) to compete unfairly with Prime Appearance and solicit its customers on behalf of RealClean.

47. For instance, on or about April 14, 2026, a Prime Appearance representative, Zach Vardaman, witnessed Gary cleaning a private aircraft at Palm Beach International Airport ("PBI"). Gary's conduct is evidenced by the following images taken by Mr. Vardaman (Gary identified in red):



48. Moreover, on that same day, Gary texted one of his former colleagues at Prime Appearance about whether Prime Appearance had returned his access badge for the Fort Lauderdale-Hollywood International Airport ("FLL"). Upon information and belief, Gary was inquiring about the status of the badge return so that he could acquire a new badge to conduct competitive work on behalf of RealClean.

49. Both PBI and FLL are airports at which Gary frequently serviced Prime Appearance's customers during his employment. As such, they are well within the restricted territory of the non-competition covenant in the Agreement.



50. Further, on or about May 20, 2026, Gary attended an aviation industry convention, the South Florida Business Aviation Association ("SFBAA"), on behalf of RealClean, as demonstrated by the screen capture from a LinkedIn post by the SFBAA below (Gary pictured at left):




51. Thereafter, on or about June 9, 2026, Prime Appearance was informed that Gary had solicited Cesar Gomez Curbelo, a Prime Appearance employee, on multiple occasions.

52. Additionally, on or about July 1, 2026, Mr. Vardaman again encountered Gary and another RealClean representative, both of whom were wearing RealClean-branded shirts, at PBI.

53. Furthermore, on or about July 7, 2026, Prime Appearance again witnessed Gary at PBI. This time, Gary was openly recruiting Prime Appearance employees by informing them that RealClean was actively hiring.

54. Since Gary's departure from Prime Appearance and his unlawful activity on behalf of RealClean, at least three Prime Appearance employees have left to join RealClean, including Steven Joiner, Jesus Yepez, and David Rodriguez. Upon information and belief, some or all of these employee departures are due to Gary's unlawful recruitment efforts.

55. Moreover, upon information and belief, RealClean recently cleaned an aircraft owned by Fair Wind, a Prime Appearance customer. Gary dealt with Fair Wind throughout his employment with Prime Appearance, including during the last 12 months of his tenure, and he was

privy to confidential information about this customer through his work for Prime Appearance, including Fair Wind's agreements with Prime Appearance, information related to the history of the different aircraft Prime Appearance has serviced for Fair Wind in south Florida, and Prime Appearance's pricing for different Fair Wind aircraft. Upon information and belief, this customer conversion is due to Gary and RealClean's unlawful efforts.

56. Upon information and belief, Gary has solicited multiple other customers of Prime Appearance. Indeed, the screen capture from his LinkedIn profile below illustrates these efforts:




57. Upon information and belief, Gary's unlawful efforts are ongoing.

58. Absent injunctive relief, Prime Appearance will be irreparably harmed by Gary's conduct.

## IV. Prime Appearance's Correspondence with RealClean's Counsel

59. As an initial matter, upon information and belief, RealClean is a franchise of RealClean Franchisor, LLC (the "**Franchisor**").

60. Upon discovering Gary's extensive misconduct, Prime Appearance immediately sent a cease-and-desist letter to RealClean, informing it of Gary's restrictive covenants. Accordingly, RealClean was aware of Gary's restrictive covenants no later than May 6, 2026. Prime Appearance also sent its letter to RealClean's sister franchises in other states, as well as to the Franchisor. In addition to Gary, the letter addressed the recruitment of Prime Appearance's employees in various other states.

61. Thereafter, throughout the months of May and June 2026, counsel for Prime Appearance exchanged multiple emails with counsel for the Franchisor (who gave the initial impression that he also represented the relevant franchisees, including RealClean). However, after these months of delayed responses and vague negotiations from the Franchisor's counsel, he ultimately pulled the rug out from under Prime Appearance by abruptly informing it on or about July 1, 2026 that he did not represent any of the franchisees, including RealClean, and thus was not in a position to address Gary's situation.

62. Thus, Gary and RealClean continue to ignore Prime Appearance's letter demanding they comply with the Agreement.

63. Moreover, despite its knowledge of the Agreement and the restrictive covenants therein, RealClean continues to employ Gary in a directly competitive role, and, upon information and belief, has induced him to further breach the Agreement by soliciting Prime Appearance's customers and recruiting its employees.

64. Moreover, upon information and belief, RealClean possesses and has misused Prime Appearance's pricing list stolen by Gary to offer more favorable pricing to Prime Appearance's customers and undercut Prime Appearance's competitive standing.

## FIRST CLAIM FOR RELIEF
### BREACH OF CONTRACT
### AGAINST GARY

65. Prime Appearance incorporates by reference its allegations set forth in paragraphs 1 through 64 of this Complaint as if fully set forth herein.

66. Gary entered into valid non-competition, customer non-solicitation, employee non-solicitation, and confidentiality covenants in the Agreement for good and valuable consideration, whereby he agreed:

(a) that, for a period of 12 months after the end of his employment with Prime Appearance, he would refrain from performing any of the services he performed for Prime Appearance to a competitor of Prime Appearance within a limited geographic territory and soliciting customers or prospects of Prime Appearance with whom he had material contract in the year preceding the termination of his employment with Prime Appearance;

(b) that, for a period of six months following the end of his employment with Prime Appearance, he would refrain from soliciting Prime Appearance's employees and employees of Prime Appearance's customers with whom he had material contact; and

(c) that he would not use, publish, or disclose Prime Appearance's confidential information and trade secrets after the end of his employment with Prime Appearance.

67. Gary's conduct on behalf of RealClean constitutes a violation of each of these covenants because: (a) he is working for RealClean, a direct competitor of Prime Appearance, within the restricted territory and providing the same or similar services that he provided on behalf of Prime Appearance; (b) he is actively soliciting Prime Appearance customers with whom he had

material contact while at Prime Appearance; (c) he is actively soliciting and recruiting Prime Appearance employees with whom he worked while at Prime Appearance; and (d) he has stolen and is actively using Prime Appearance's confidential information (including, but not limited to, its Florida customer pricing list) in furtherance of his previously-described misconduct on behalf of RealClean.

68. Prime Appearance has complied with the material terms of the Agreement at all times relevant.

69. As a direct and proximate result of Gary's actions, Prime Appearance has suffered money damages in that it has lost business from clients, employees, and goodwill in the areas where Gary is violating the Agreement.

70. As a direct and proximate result of Gary's actions in breach of the Agreement, Prime Appearance has been, and will continue to be, irreparably harmed.

## SECOND CLAIM FOR RELIEF
### DEFEND TRADE SECRETS ACT (18 U.S.C. § 1831 *ET SEQ.*)
### AGAINST GARY

71. Prime Appearance incorporates by reference its allegations set forth in paragraphs 1 through 64 of this Complaint as if fully set forth herein.

72. The materials that Gary sent to his personal Gmail account are trade secrets of Prime Appearance subject to protection under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*

73. The materials are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use. Prime Appearance has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

74. The materials are related to products or services used in, or intended for use in, interstate commerce.

75. Prime Appearance takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of this information. Those steps include: (a) handbook and IT policies; (b) restricting availability of certain confidential information to key employees; (c) requiring employees to execute agreements with confidentiality provisions and restrictive covenants; (d) physical security measures to protect against the disclosure of sensitive materials to third parties; and (e) IT security measures, such as password protection for all computers and segregation of certain files so that only employees with a need to access the files can do so.

76. Gary obtained and likely used the information contained in these materials and data by improper means in violation of his contractual and other obligations to Prime Appearance when he sent the Florida customer pricing list to his personal email.

77. Gary engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Gary owed and continue to owe Prime Appearance as an agent, employee, and representative of Prime Appearance.

78. Gary's foregoing conduct constitutes an actual and threatened misappropriation and misuse of Prime Appearance's trade secret information in violation of the DTSA.

79. As a direct and proximate result of Gary's actual and threatened misappropriation of Prime Appearance's trade secrets, Prime Appearance has suffered lost profits and/or Gary has been unjustly enriched by his theft of business.

80. In the event that Prime Appearance cannot show lost profits or unjust enrichment, then it is entitled to a royalty value of the stolen trade secrets.

81. Gary's acts of misappropriation have been willful and malicious, which entitles Prime Appearance to recovery of its attorneys' fees and to exemplary damages.

82. As a direct and proximate result of Gary's actual and threatened misappropriation of Prime Appearance's trade secrets, Prime Appearance has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless Gary is enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to Prime Appearance.

## THIRD CLAIM FOR RELIEF

### MISAPPROPRIATION OF TRADE SECRETS
### (TEXAS UNIFORM TRADE SECRETS ACT; TEXAS CIVIL PRACTICES & REMEDIES CODE § 134A)
### AGAINST GARY

83. Prime Appearance incorporates by reference its allegations set forth in paragraphs 1 through 64 of this Complaint as if fully set forth herein.

84. During his employment with Prime Appearance, Gary had access to, and did access, Prime Appearance's confidential information and trade secrets, including, without limitation, Prime Appearance's Florida customer pricing list that he sent to his personal Gmail account.

85. This confidential and proprietary information taken by Gary constitutes Confidential Information pursuant to the Agreement and trade secrets within the meaning of the Texas Uniform Trade Secrets Act, Texas Civil Practices & Remedies Code § 134A.002(6) because Prime Appearance derives independent economic value from such information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

86. In his capacity as a Senior Operations Manager for Prime Appearance, Gary had access to, and did access, Prime Appearance's trade secrets.

87. Gary and RealClean benefited from and have used Prime Appearance's trade secrets to unlawfully compete with Prime Appearance and solicit its customers and employees.

88. Prime Appearance exerts reasonable and substantial efforts to keep its trade secrets secret. Prime Appearance took reasonable precautions under the circumstances to protect its trade secrets, and all parties with access to its trade secrets (including Gary) were subject to obligations to maintain their secrecy.

89. Prime Appearance derives significant economic value from such secrecy by depriving competitors like RealClean of opportunities to use Prime Appearance's trade secrets to gain a competitive advantage.

90. Since his departure from Prime Appearance, Gary has misappropriated Prime Appearance's trade secrets within the meaning of Tex. Civ. Prac. Rem. § 134A.003(c) by sending them to his personal email in violation of Prime Appearance policy and the Agreement. He has since used that information to unlawfully solicit Prime Appearance's customers and employees on behalf of RealClean.

91. At all material times, Gary and RealClean have acted willfully, maliciously, and in bad faith.

92. As a direct and proximate result of Gary's actual and threatened misappropriation of Prime Appearance's trade secrets, Prime Appearance has suffered lost profits and/or Gary has been unjustly enriched by his theft of business.

93. In the event that Prime Appearance cannot show lost profits or unjust enrichment, then it is entitled to a royalty value of the stolen trade secrets.

94. Gary's acts of misappropriation have been willful and malicious, which entitles Prime Appearance to recovery of its attorneys' fees and to exemplary damages.

95. As a direct and proximate result of Gary's actual and threatened misappropriation of Prime Appearance's trade secrets, Prime Appearance has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless Gary is enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to Prime Appearance.

## FOURTH CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH CONTRACT
### AGAINST REALCLEAN

96. Prime Appearance incorporates by reference its allegations set forth in paragraphs 1 through 64 of this Complaint as if fully set forth herein.

97. Upon information and belief, RealClean was aware of the Agreement between Gary and Prime Appearance, and the obligations contained therein when it hired Gary, or, at the very latest, when Prime Appearance advised it of the covenants via letter.

98. RealClean was thus aware that the Agreement restricted Gary from actively competing against Prime Appearance by providing the same or similar services and soliciting customers and employees in the restricted territory on its behalf.

99. Despite its awareness of the Agreement, RealClean willfully and intentionally interfered with it by inducing and causing Gary to breach the restrictive covenants contained in the Agreement, specifically the non-competition, customer non-solicitation, employee non-solicitation, and confidentiality provisions, as described herein.

100. RealClean has no legitimate privilege, justification, or excuse for its interference.

101. Prime Appearance has been injured as a direct and proximate result of RealClean's conduct, including actual and exemplary damages, loss of goodwill, loss of reputation, diminished capacity to compete, diverted business, lost profits both past and future, costs and expenses, and other losses.

102. Further, upon information and belief, RealClean has knowingly attempted to interfere with Gary's continuing obligations to Prime Appearance in the Agreement.

103. Prime Appearance is entitled to recover its actual damages, disgorgement of profits, exemplary or punitive damages, pre and post judgment interest, and costs.

104. RealClean will continue its interference with the Agreement, which will cause Prime Appearance irreparable injury, unless the Court enjoins its improper activities. Prime Appearance, therefore, is also entitled to injunctive relief to prevent this ongoing tortious interference.

## FIFTH CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### AGAINST REALCLEAN

105. Prime Appearance incorporates by reference its allegations set forth in paragraphs 1 through 64 of this Complaint as if fully set forth herein.

106. Upon information and belief, RealClean was fully aware of the Agreement between Gary and Prime Appearance, and the obligations contained therein when it hired Gary. It was also fully aware of the Agreement's restrictions on competition, customer solicitation, employee solicitation, and disclosure of confidential information and trade secrets. RealClean, by and through Gary, was also made privy to Prime Appearance's trade secrets, including, but not limited to, its Florida customer pricing list.

107. Upon information and belief, by employing Gary in an unlawfully competitive manner, by directing Gary to unlawfully solicit Prime Appearance's customers and employees, and by intentionally and improperly using Prime Appearance's confidential, proprietary, and trade secret information, Gary and RealClean, in coordination, have actively interfered with Prime Appearance's business relationships.

108. As a consequence of RealClean's and Gary's actions, Prime Appearance has lost significant business and customer goodwill that it otherwise would not lose.

109. Upon information and belief, Prime Appearance has suffered significant damages as a result of the unlawful actions described above and will remain irreparably harmed.

110. Prime Appearance is entitled to recover its actual damages, disgorgement of profits, exemplary or punitive damages, pre and post judgment interest, and costs.

111. RealClean will continue its interference with Prime Appearance's business relations, which will cause Prime Appearance irreparable injury, unless the Court enjoins its improper activities. Prime Appearance, therefore, is also entitled to injunctive relief to prevent this ongoing tortious interference.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Prime Appearance respectfully requests the Court grant the following relief:

A. A temporary restraining order against Gary and all others acting in active concert with him (including RealClean) for the following relief: (i) requiring Gary to return to Prime Appearance all confidential, proprietary, and/or trade secret information belonging to Prime Appearance that is still within his possession, including but not limited to the materials that Gary retained by sending them to his personal Gmail, and any intellectual property derived therefrom

(in whatever form such information may exist); (ii) requiring Gary to make available for inspection and imaging any computers, external storage devices, or personal data devices on which he accessed and/or retained Prime Appearance's confidential information or trade secrets as well as any and all Cloud-based file management accounts, email accounts, or other devices or accounts on which Prime Appearance's information could reside; (iii) enjoining Gary from using, accessing, or disclosing any of Prime Appearance's proprietary information, confidential information and trade secrets; (iv) requiring that Gary set forth under oath that he has identified and returned all Prime Appearance confidential information and trade secrets in his possession and that he did not disclose any of Prime Appearance's confidential information or trade secrets to any additional third parties OR if he did that he will identify with specificity the names of the individuals or entities (governmental or private) that he has made any disclosures of Prime Appearance's confidential information or trade secrets to; (v) prohibiting Gary from otherwise breaching the terms of the Agreement, including any violations of the non-competition covenant, customer non-solicitation covenant, employee non-solicitation covenant, and confidentiality covenant, specifically by selling and performing the aircraft detailing services provided by Prime Appearance (as described herein), on behalf of RealClean in the territory in which he worked for Prime Appearance; and (vi) requiring that RealClean instruct Gary to not undertake any work that would violate the terms of the Agreement, including any violations of the non-competition covenant as described above.

B. A preliminary injunction against Gary and all others acting in active concert with him for the following relief: (i) enjoining Gary from using, accessing, or disclosing any of Prime Appearance's proprietary information, confidential information and/or trade secrets; and (ii) enjoining Gary from otherwise breaching the terms of the Agreement, including any violations of

the non-competition covenant, specifically by selling and performing the aircraft detailing services provided by Prime Appearance (as described herein), on behalf of RealClean within the territory in which Gary worked on behalf of Prime Appearance.

C. The entry of a judgment for monetary damages for Gary's wrongful acts alleged herein, including, but not limited to actual damages (including all damages incurred by Prime Appearance as a result of lost customers and profits as well as unjust enrichment on the part of Defendants), pre-litigation attorneys' fees and costs, and Gary's unjust enrichment as a result of his unlawful acts;

D. An award of exemplary damages for Gary's malicious violation of the DTSA and TUTSA;

E. An award of punitive damages against RealClean for its acts of tortious interference with contractual and business relations;

F. An award of prejudgment and post-judgment interest;

G. An award of costs and attorneys' fees; and

H. An award of such other relief that the honorable Court may deem just and proper.

[*Signature Line on Next Page*]

DATED: August 20, 2026

Respectfully submitted,

*/s/ Emily P. Harbison*
**EMILY P. HARBISON**
Attorney-in-Charge
Texas Bar No. 24059892
Southern District Bar No. 902584
**FISHER PHILLIPS LLP**
910 Louisiana St., Suite 4000
Houston, Texas 77002
Telephone: (713) 292-0150
Facsimile: (713) 292-0151
eharbison@fisherphillips.com

**MICHAEL P. ELKON**
(*pro hac vice* motion forthcoming)
Georgia Bar No. 243355
**HENRY FINK**
(*pro hac vice* motion forthcoming)
Georgia Bar No. 180283
**FISHER & PHILLIPS LLP**
1230 Peachtree Street, NE
Suite 3300
Atlanta, Georgia 30309
Phone (404) 231-1400
Facsimile (404) 240-4249
melkon@fisherphillips.com
hfink@fisherphillips.com

*Counsel for Plaintiff*